May it please the Court, I'm Michael Rafel on behalf of the United States. Your Honors, in this case, the District Court wrongly overturned a jury verdict. The jury had found that the defendant illegally possessed the listed chemical ephedrine. What the District Court acquitted on, on these counts, is that the District Court's view that the defendant possessed the plant Mah-Wong and not ephedrine. In fact, the evidence was undisputed that ephedrine was contained in the Mah-Wong and the ephedrine was in its chemically unaltered form. The Mah-Wong was not a chemical compound that was something different than ephedrine. The Mah-Wong was a mixture that, among other things within the Mah-Wong, contained ephedrine in its unaltered form. Thus, this case is just like this Court's decision in Das where this Court held that a defendant can be prosecuted for distributing ephedrine when it's in a decongestant tablet, because the decongestant tablet is a mixture of ingredients which contain ephedrine in its chemically unaltered form. Here, the only difference with Das is that the mixture is natural. It's a plant that contains ephedrine. Under the defendant's view and under the District Court's view of this case, while we can prosecute a defendant for distributing large amounts of pills, decongestants containing ephedrine, we can't prosecute a defendant when the same ephedrine is contained in a natural substance in the ephedra or Mah-Wong. This is a distinction without a difference, and that's why the District Court was wrong in this regard. It's clear that this is what the District Court was ruling on. The District Court described the process of extracting the ephedrine from the Mah-Wong as a chemical process where the Mah-Wong would need to be changed. But there wasn't ephedrine in the Mah-Wong. It was ephedra in the Mah-Wong, correct? Actually, no, Your Honor. Ephedrine was in the Mah-Wong. Ephedra is a synonym for Mah-Wong. Mah-Wong and ephedra are the same thing, so we've chosen to use the term Mah-Wong in our briefs just to avoid the confusion between ephedra. All right. And I'm not a chemist, but I have a law clerk who has studied this kind of thing and has explained to me that this case is not like DAS because this was not a separate chemical compound. It was part of the plant material. As opposed to DAS, it wasn't in a carrier medium or in packaging material. You couldn't separate it out like you can with an over-the-counter Sudafed, as I understand it. It was essentially part of the plant material, and I think that's what Judge Raffitti was doing in his analysis. And Judge Raffitti doesn't lightly grant motions of acquittal over jury verdicts of guilty. So I've gone back and tried to understand your forensic chemist's analysis, and I'm not sure she really explained that you could actually separate out any listed drug from the Mah-Wong itself. Your Honor, first of all, one does not have to rely on our chemist. One can rely on the defendant's chemist, which was asked the question at page 177 of the excerpts of record, did you attempt to separate out the ephedrine that occurs naturally in the Mah-Wong? And the chemist said yes. So there's no dispute in this case. Did you attempt? Is that the question? That was the question. Was any quantity, has it ever been shown, has there ever been any case where it was shown that any quantity of ephedrine has been separated out from the Mah-Wong plant? There is not a case, Your Honor, but in this case, even the defendant's chemist was able to separate out 1.2 percent of the volume of the plant material as ephedrine. So even the defendant's chemist was able to separate out that 1.2 percent. The difference here between the experts was really how much do you extract, how much can you extract from the plant material, the Mah-Wong. And there wasn't any dispute over whether ephedrine in its chemically unaltered form exists within the Mah-Wong. Now, I agree with the court that there is a difference sort of in practical terms between the way that the ephedrine is in Mah-Wong versus the way that it's in a decongestant. A decongestant is man-made. Different ingredients are put together. Mah-Wong ephedrine occurs naturally in the plant. There's that sort of practical difference. But as far as the drug statutes go, simply reading the drug statutes and as far as sort of any operational way, I don't see where there can be this distinction between having ephedrine in a cold tablet and having it naturally in a plant. In either case, it's still mixed in with other ingredients in its chemically unaltered form, and it's still even, according to defendant's expert, can be separated out in some quantity, in 1.2 percent according to defendant's expert. What about the DEA final rules for ephedrine regulation, which exempts plant material such as Mah-Wong, seems to anyway, containing ephedrine unaltered from its natural state? I guess they, because the DEA believes they're not a likely source of diversion due to their inherent composition. I'm not sure about that, Your Honor. What we have, you know, page 28, 29 of our brief, the DEA rule says that Mah-Wong can and is being used as the source of precursor material for the illicit production of methamphetamine. So that only confirms, as of page 28 of our brief, that the DEA rule believes that ephedrine can be found in the Mah-Wong and can, in fact, be used to manufacture methamphetamine. The DEA, you know, page 29 of our brief, DEA rule also states the DEA is aware that methamphetamine can be produced from ephedrine when extracted directly from the raw plant material.  Exemption, what about the, let's see, what is it, the Federal 21 CFR? It says it has an exemption of harvested plant material containing these six listed chemicals. The final rulemaking also establishes an exemption for a category of chemical mixtures which contain ephedrine, and it names some other drugs. While these mixtures may have a higher concentration limit than provided by the DEA, it believes they are not a likely source of diversion due to their inherent composition. Is this the rule cited in the briefs? I don't know if it's the rule cited in your briefs, but it's the rule. It's the rule in the Code of Federal Regulations. Okay. Well, you don't have it? You don't have a copy of that rule, May 1, 2003, Rules and Regulations? I'm not familiar with that one, if it's different than the rule cited in the briefs. I'm sorry about that, Your Honor, but, Your Honor, even if there is a DEA rule that says that some percentage, as I'm understanding the Court, that some percentage is not enough, that the DEA is concerned about it, one reason why it would be surprising to me is because since this case, of course, ephedra has been made illegal more broadly than just to manufacture methamphetamine. It's been named. Well, what's the rule cited in your briefs? The DEA rule, it's at the 6th DA Federal Register 23195. And you didn't cite this rule? It may be the same rule, Your Honor, but this rule, because this rule was May 1, 2003, but this rule states the DEA is aware that the DEA is aware. It's not the same thing as DEA is listing it. And this rule that I'm reading to you says, yeah, but it's not sufficient. It's not a likely source of diversion due to the inherent composition. And you're putting this guy away for, what, 20 years or 10 years? What's the mandatory minimum? The mandatory minimum is 10 years. Ten years here for some plant material that the DEA doesn't even think is sufficient to manufacture large quantities of methamphetamine, or you're trying to anyway. Well, this DEA rule does say that amounts 5 percent or less are unlikely to be used to manufacture methamphetamine. This, you know, this amount here was 8 percent ephedrine in defendant's Mawang. Based on which expert? Based on, well, both experts. The Mawang tested in this case by the government's expert was the Mawang actually seized from defendant, and that was found to contain 8 percent ephedrine. The defendant's expert, for reasons I can't fathom, did not test the Mawang actually seized from defendant, but tested Mawang that defense counsel gave to him. And defense counsel represented that that Mawang also contained 8 percent ephedrine. So my understanding of the rule that we cite in this brief, the DEA has this 5 percent threshold for what they're most worried about. What's more likely to be used to make methamphetamine? And here, if that threshold is 5 percent, as I read the rule, the 8 percent mixture that was seized from defendant is over that amount. And I would mention also that this mixture from defendant, while I describe it as a plant material and it's not literally man-made, it is Mawang extract, meaning it's in some way harvested by persons in China and standardized to be 8 percent. Well, what was the evidence that the government produced to show that methamphetamine could actually be manufactured from the Mawang at issue in this case? Well, two experts, Frascia Martinez and Connors, both testified that based on their experience, methamphetamine can be made from ephedrine that is taken from the Mawang. That's hypothetical. What about the actual Mawang in this case? The expert Martinez did test this Mawang in this case and did determine that it was 8 percent ephedrine and did separate out. And did he actually demonstrate how methamphetamine could be created from it? She did not do that extra step to show that methamphetamine could be created on what she extracted. She based it on her prior experience turning ephedrine into methamphetamine. And once you have the ephedrine out of the substance, which even the defendant's expert said he could do, he could take 1.2 percent out of it. Once you have that out, there's no reason to think that it would be any different than any other time that ephedrine has been extracted from material, whether it's a decongestant or it's plant material. And both Martinez and Connors, Connors would ask directly, can you make meth from ephedrine that you extract from Mawang? And he said, yes, you can. On a motion for acquittal, of course, the standard is you've got to draw the inferences in favor of the government. And the district court didn't do that here, at least in practical terms, did not do that because it rejected this. Well, maybe he didn't think he'd put in sufficient evidence to demonstrate that methamphetamine could be made from whatever could be extracted from this plant material. Well, you know, he did not make a finding. He made a finding squarely contrary to that I'll get to in a moment. But what the district court found was that there wasn't ephedrine at all. It's not at the step of whether you can make meth from it. The district court found at page 350 of the Excerpt of Rector when he made his ruling that what the government proved is the defendant possessed Mawang and not ephedrine. That's the mistake the district court made. The district court didn't get to the step of functionally what can you do with that ephedrine afterwards. And the reason why the – I mean, there's no reason to think the district court would have found that second step. And the way we know that is because of the insufficiency in your forensic chemist's analysis. And we can affirm on any basis it's in the record. Respectfully, when this case got to sentencing, there was still an ephedrine issue in this case because of the conspiracy count. Right. Then the district court found – the district court had to find the 3-kilogram quantity of ephedrine in order to get to the highest level under the sentencing guidelines. The district court said he's way over this level because this ephedrine that was extracted could have been used to make 170 kilograms of methamphetamine using even the defendant's expert's analysis. So the district court, in sentencing, got to that second step and said, yes, with this ephedrine, in the conspiracy count, one could have made 170 kilograms even using the defendant's expert's analysis, which shows the district court would have rejected even the second step of functionally, you know, what can this be used for. But what the district court's actual ruling was on acquittal was this is not ephedrine. This is Ma Wong. And that's – So what you're suggesting is that if the district court acted consistently, he would hold that no matter how much ephedrine could be extracted from a quantity of Ma Wong or ephedrine, that that would be insufficient. The very fact that it was in the form of Ma Wong precluded successful prosecution. That's your understanding of the district court's ruling? Certainly. If that would have been the district court's ruling, that the reason for the acquittal was that you can't make methamphetamine from this ephedrine, the district court should have found no quantity of sentencing as well. The district court did not do that. So that's what, first of all, his ruling was. It's very clear that it's Ma Wong, not ephedrine. And that's just a mistake. And it's wrong under the Doss case. And so – and it satisfies the literal terms of the statute to simply possess any quantity of ephedrine. That's the Campbell case we cited from the First Circuit. And there's cases from this circuit that would indicate that, too, just a small quantity of ephedrine. So we're taking on a little bit more than we have to when we get to this practical stage and say, how practical is it to make ephedrine – or to make methamphetamine from this ephedrine that's extracted? I would concede that if it were impossible to make any amount of methamphetamine from the ephedrine that one extracts, this under Judge Wardlaw's opinion in a case called Combs, where a person was disposing of trace quantities of methamphetamine, the waste material. But it was actually methamphetamine. It wasn't plant material that you had to get something else out of and then go through this process to create the methamphetamine. There was actual methamphetamine in those barrels in that case. Yes. And that was a methamphetamine case, not a listed chemical case. And under the logic of that case, where there was a totally unusable trace quantity and the defendant was intending to dispose of it, this Court held that you can't be prosecuted for distributing methamphetamine. So if it were a totally unusable quantity, that would be one thing. But if there is some quantity, and here the defendant, 1,307 barrels of Mah-Wong distributed between December 2001 and April 2002. He didn't distribute all of those. He distributed about 700 of them. About 500 were seized. Large quantities being distributed. This appears to be a successful business just from that going on. And even defendant's chemist said that he can extract some ephedrine from the Mah-Wong. There's no dispute that the ephedrine is in its chemically unaltered form in the Mah-Wong. All you have to do is boil it in water and it's separated out? More or less. The defendant's expert's final way of testing it, which he described as fairly simple at page 197 of the record, was just to simply steam it with a steamer of sorts. And he added something called, I think, oxalate to it to make it a solid. And he described this process as fairly simple. His dispute with the government was simply that he couldn't get a very high yield out of it. That, if you do an economic analysis, even that yield is enough to make a profit doing this. And that appears to have been what's happening here because defendant is distributing this over a period of months in quantities of hundreds of barrels. But the legal issue here should come down to simply is there ephedrine in its chemically unaltered form in the Mah-Wong? That's what the district court ruled on. He said it's Mah-Wong, it's not ephedrine. We're saying the ephedrine is in its Mah-Wong, in the Mah-Wong. The practicality of how much can be used to make meth is an extra step for sentencing, but it shouldn't have been used for an acquittal here. I have a minute and a half. Are you familiar with U.S. v. Rossiger? Yes, Your Honor. It's the only Ninth Circuit case on point, I mean, that discusses Mah-Wong. And it does, Your Honor. I can see that. The sentence was vacated there, and the expert there said over the course of 15 years, I have never seen a case where the methamphetamine was made from ephedrine or a pseudoephedrine extracted from Mah-Wong tea. There's several points about that case, Your Honor. First of all, Your Honor, that is a sentencing case. The court did not vacate the conviction. The court said under the facts in the pre-sentence report in that case, the court said there wasn't enough to show that that defendant, who was a kid, whose mother reported him for having this ephedrine tea, there wasn't enough evidence to show that this defendant could have made methamphetamine for sentencing purposes. So the court vacated the sentence. Now, on remand, it could have happened, the government could have put in better evidence of the defendant's intent or of the actuality of making methamphetamine from the ephedrine tea. It is true that the cases out there, and most of the cases we prosecute, are pseudoephedrine cases from decongestants. That is true. There are no other cases. To my knowledge, we have not, Your Honor. These natural substances, and you can see from page 306 of the record, the defendant was also considering chicken feed, which contains ephedrine, as something that he gave a document using chicken feed, which contains ephedrine in it also. As it's harder to get these over-the-counter drugs because of more regulations on them, defendants may turn to other ways to get the ephedrine. And our position is it doesn't matter, so long as it's in its chemically unaltered form, it doesn't matter whether it's in chicken feed, Ma Long, or a decongestant. It's still ephedrine. It still meets the terms of the statute, and it still should be prosecutable with the proper intent, meaning the defendant intends for it to be used to make methamphetamine. Rossiker was a sentencing case, and it did not vacate the conviction. It said under the evidence in the pre-sentence report some very conclusory evidence that that was not enough in that case to prove a quantity of methamphetamine for sentencing. Just kind of an analogous question. The Oklahoma City bombers, they had a large quantity of fertilizer that they used to set off these bombs. Could they be prosecuted for having a large quantity of fertilizer? No, because the government has to prove not just that a defendant possesses ephedrine, but also that the defendant possesses it knowing or having reason to believe that it's going to be used to make meth. That's what these cases always turn on. The defendant's defenses are always, yes, I was selling this or I was transporting it, but I didn't know it was going to be used to make meth. For a courier, for example, that's what a courier's defense might be. I had this in my hands. I was transporting it. I wasn't using it to make meth. If the defendant was selling large quantities of fertilizer or decongestants or Ma Wong for some other purpose, for cold medicines, for making athletic supplements, which is what ephedrine was used for, that may be illegal now for another reason, but that's not prosecutable as a listed chemical case under 841C because we have to prove this extra knowledge of knowing or having reason to believe it would be used to make methamphetamine. My time is out, Your Honors, and I have to sit down, I suppose, but I would appreciate being indulged with a small amount of rebuttal for the cross-appeal cases. Thank you, Mr. Chair. Does anyone else have any questions on any of the other issues? Okay. Thank you. Good morning. Ben Coleman for Mr. Lowe. I assume I'm just doing everything right now. I'll respond to the government's appeal first and then proceed to our cross-appeal. I think with respect to the government's appeal, what they're looking for is just some broad general ruling that ephedra is a listed chemical. And that's not what Judge Rafiti held, and that's not what this Court should be here to do. What we're looking at is, was the record that was produced at this particular trial, the evidence that was produced at this particular trial, was it sufficient to establish that the ephedra in this case, which everyone concedes it was ephedra or Mahlon, whether that and the Supreme Court's case in Chapman, which is what Doss is based on, whether that ephedra constituted a mixture. And the bottom line is that the government presented no evidence of that. And that's the problem. The definition of a mixture in Doss, which is based on Chapman, is a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that, however thoroughly commingled or regarded as retaining a separate existence. Now, the government presented no evidence on that. The only thing that the government presented was that perhaps a small amount of ephedra could be extracted from this ephedra. But that's it. That's all they proved. They didn't prove anything about whether the ephedra was a matter consisting of two or more components that did not bear a fixed proportion to one another, nor did they prove that when the ephedra is in its commingled state, that the different elements of that commingled state retain their separate existence. The government offered no evidence of that. So maybe in some other case, the government will have an ephedra case and they'll try to prosecute it, and maybe they'll present testimony from their own experts that satisfy this standard. But they just didn't do it in this case. And that's what Judge Raffidi was saying, was that you prove that this was ephedra. Okay, ephedra is not a listed chemical. And that under the DAS case, you didn't satisfy the DAS standard of showing that this was a mixture from which the ephedra maintained its separate existence and could be extracted. They just offered no evidence of that. Okay, what about the government's argument that his sentencing ruling is inconsistent with his finding that it wasn't, I guess it wasn't, didn't fall within the chemical mixture discussion in DAS? Right. Well, there are two, I think there are two responses to that. Number one is obviously the burdens of proof are significantly different at the time of sentencing than at the time of trial. The sentencing where you're operating under either a preponderance of the evidence or clear and convincing evidence at most, whereas at trial you're operating under beyond a reasonable doubt. But the second thing is that I don't think there's any inconsistency at all in the fact that assuming, Judge Rafiti's assuming that you can extract some, let's assume you can extract some ephedra. Well, that's not, that doesn't meet the DAS test. Simply being able to extract, you know, a small quantity does not thereby mean that you have a mixture, as that term is defined in DAS. So, yes, maybe you could extract a little bit, but that still doesn't satisfy the DAS standard. So I don't really think there is any inconsistency between the judge's sentencing reasoning and the Rule 29. If you can extract it, why is it not a mixture? If it can be obtained out of the ephedra, then what is the difference between being a mixture and being something that you can extract it out of? Well, that's a great question. And what we need is an answer from an expert who would have testified at the trial, who would have said, I don't know what the answer is because there's no evidence in the record one way or the other. That's the problem. If an expert had come in and said, by the simple fact of extracting this, we then can determine that this is a mixture containing two or more components that do not bear a fixed proportion to one another, and that however thoroughly commingled, are regarded as retaining their separate existence. If that's the case, if an expert could get up there and said, and could say that, and actually had said that in this case, then they maybe would have proven their case. The problem is there was no testimony to that effect, that the simple fact that you can extract a little bit, that makes it a mixture. There was nothing to that effect in the record. And so ---- As I understand it, it was Mr. Das who introduced the question of mixture into the case and said, in effect, I did not possess ephedrine because what I possessed was a mixture and mixtures are not covered by the statute. And the court considered that and rejected it and said, no, mixtures are covered by the statute. Now, how can you read into that rejection of Mr. Das' argument the contention that unless it's a mixture, it doesn't qualify? Why doesn't the plain meaning of the statute indicate that anything that contains possession of ephedrine and that the crucial question then becomes, why was it possessed? In this case, there's overwhelming evidence that it was possessed in order to distribute it as a precursor for methamphetamine manufacture. I mean, why isn't ---- Well, because I think in Das, the Das court, as Your Honor is saying, held that, yes, a mixture can ---- if you possess a mixture that contains the ephedrine, that can constitute a violation of the statute. But if it's ---- Right. But it did so in the context of rejecting Mr. Das' argument that mixtures weren't covered. In other words, I don't understand how the argument is that because Mr. Das was wrong that mixtures are covered. Right. Some other argument that ephedrine in its pure state or in its biological state is covered. I understand Your Honor's question. And the reason that Das is read that way is because it distinguished between a mixture and a chemical compound, which is what it ---- and it relied on Chapman v. United States, which is a Supreme Court case. And it was saying mixtures are covered. Chemical compounds are not covered. And the question in this case is ---- Were chemical compounds before the court in Das? Well, the court held that it wasn't a chemical compound, that it was a mixture. Right. And that's all based on ---- You're drawing a negative inference. What did the court hold in Chapman? Did they hold that chemical compounds are not covered? I believe, again, it was the same thing. They held that it was a mixture, and therefore it was covered. But the ---- All right. My question is, how do you get, logically, from the rejection of Mr. Das and, by extension, Mr. Chapman's argument, how do you get the inference that something that was not present in those cases would not qualify? Wouldn't that be dicta? If the court wants to read it as dicta, the court could probably read it as dicta. The bottom line, though, is that it's coming from the Supreme Court and this Court as a prior case, where it's plainly distinguishing between mixtures, saying these are covered, and chemical compounds, implying that those are not covered. And so I think it would be really trying to narrowly read both the Supreme Court's decision in Chapman and this Court's decision in Das, as Your Honor suggested. Although, presumably because those cases specifically held that those were mixtures and therefore were covered, they didn't reach the negative inference that you're talking about. But I think it's fairly plain from the cases. If it's a chemical compound, would that mean you could not extract the amphetamine from it? I don't believe so. And these, again, are questions, and I think this answers both questions, is that we don't have any expert testimony on any of this. We don't even have expert testimony as to Your Honor's question. I'm just asking you from the standpoint of your preparation for trial, is there any indication that a chemical compound that has ephedrine in it, that the ephedrine cannot be extracted? I wasn't a trial lawyer, but so the answer to the question is I'm just being straight up. I don't know. And this is the problem. Well, if there's no real difference between them, then why do you have to present evidence about it? It would seem to me that it ought to be a matter of defense, that, look, you can't hold this defendant liable because it is a chemical compound, and chemical compounds are such that you cannot extract the ephedrine. Well, the reason why we can't hold this, we don't have any evidence in the record as to whether this was a mixture, whether it was a chemical compound. Yes, but you do have evidence that you can extract ephedrine from it. Yes. That's the only thing we have, and that's it. And what the government is trying to say is the simple thing. Why isn't that enough? Because, again, it comes down to I believe it's their burden under Chapman and Das to prove that it is a mixture, not a chemical compound. It's the government's burden to prove their case beyond a reasonable doubt. Does that really make any sense? I mean, if you can extract ephedrine from it, and that seems to be the key issue, doesn't it? If you can get it from it, maybe you could, as a matter of defense, show that it's a compound and you couldn't extract it, but there was clear evidence that it could be extracted. Well, I think the answer is it's the government's burden. It shouldn't be an affirmative defense, and that's why we started the Orduno Aguilera case, which was a similar circumstance where the prosecution presented the testimony, presented testimony from an expert that this was ester derivative of a particular drug, but didn't take the extra step to prove that the drug promoted muscle growth. And the court found, look, it's their burden. They have the burden to prove beyond a reasonable doubt that this was a listed chemical in this case, and they just didn't do it. They didn't satisfy the test. If I could, I do would like to address a couple of the issues that we've raised on the cross-appeal, because the bottom line is that even if the Court affirms the district court's ruling, there's still a 235-month sentence that's hanging over Mr. Lowe's head. So I did want to get to a couple of those issues. The first one is that I think it's undisputed that Mr. Lowe is at least entitled to an amyline remand for sentencing. I don't – I hope there's no dispute on that. Both parties have agreed to that, haven't they? Well, the government, when they submitted their brief, amyline 2 or 3, whatever you want to call it, hadn't been decided yet. But I hope that today they'll concede that he is at least entitled to a limited remand for resentencing. I did want to – What about if the conviction for conspiracy and sentencing on the basis of the quantity of methamphetamine, which would result in a 10-year mandatory minimum, it stands? I mean, the 10-year mandatory minimum would still be the sentence. Did he get more than that? If the conspiracy conviction stands, the 10-year minimum would be in effect, but he got 20 years almost. So he could still get down to 10. Okay. So that's why I think the amyline remand is important. With respect to the conspiracy conviction, I did want to draw the Court's attention to one part of the record that I didn't do in the briefs, and that is government's excerpt of record at 151. And this relates to the issue about whether Mr. Lowe and his telephonic conversations with those particular individuals, whether they were distributors for him or whether they were purchasers of the product. And at 151 of the excerpt, this is the prosecutor who's describing these conversations, and he says that they're between Mr. Lowe and his customers, who the government believes is his customers, who the government will argue he was selling the stuff to. So I think the government, you know, they at trial, they were taking the position that these individuals were customers. And, of course, under this Court's precedent, you can't have a conspiracy between a buyer and a seller. So I don't think that that evidence is sufficient to establish the conspiracy. With respect to a couple of the other individuals, there was one in a van and one who was standing in an alley, those individuals were merely present. There's no evidence whatsoever that they joined in an agreement to carry out any of the objectives of the conspiracy. So that leaves Ms. Kwan, who was the acquitted co-defendant. Now, we've taken the position that the conspiracy and conviction cannot stand based on her because she's been acquitted. Even if the Court disagrees with that, even if the Court says, you know what, just because she was acquitted does not mean that we can't rely on that, rely on a conspiracy with her to sustain the conviction. I still think when you take a look at the fact that the jury acquitted her, number one. Number two, there is no, there's not one statement from her that's ever been introduced into the record to demonstrate that she formed an agreement with Mr. Lowe to manufacture or assist in the manufacture of controlled substances. There's not one statement from her to show what exactly was her state of mind and whether she agreed. Admittedly, there's evidence in the record that she assisted, that she did things like move bags from the truck to the house or put barrels in the truck, and she did things like that. But there's nothing in the evidence to establish that they had reached some type of agreement and that she knew what the ultimate objects were of handling these substances. Wasn't there some evidence that she attempted to mask or eliminate indications on the packaging that might suggest an inference of guilty knowledge? Your Honor is correct. I think there was indication that she maybe pulled off some labels or something like that from the package. But I think that, I don't think that that inference is strong enough to sustain a conviction beyond guilt, to sustain a find of guilt beyond a reasonable doubt. There are several different inferences that could be drawn from that, in addition to guilty knowledge. Don't we have to, for purposes of Mr. Lowe's conviction, have to draw all the inferences favorable to the government? You have to draw all reasonable inferences favorable to the government. And when looking at those... You mean reasonable inferences regarding his co-defendant's state of mind? That's an interesting question, because the jury acquitted her. But we've maintained a position that you can't base the conspiracy on her because of her acquittal. But assuming you disagree with that, and assuming... Well, the Supreme Court disagrees with that, doesn't it? Well, it's our position that this Court interpreted the Supreme Court's decision in Powell as saying that the acquittal of a co-conspirator does not in and of itself of the only other charged co-conspirator does not in and of itself and the analysis this Court then has to look at the record and determine whether the defendant, the language that this Court used, conspired with others known and unknown. It didn't say this Court can still look at the potential conspiracy between the defendant and the acquitted co-conspirator. But with respect to the inferences, the question is, does that inference in and of itself, which is really the only inference out there, in and of itself, does that demonstrate that she entered into this agreement to assist in the manufacture of methamphetamine to agree to manufacture methamphetamine? And it's our argument that, as the jury found, that inference is just not strong enough to convict beyond a reasonable doubt. The final thing, I did want to touch on the mens rea instruction as to the 841C counts. It's our position that I know I've got an uphill battle on this because, number one, it's plain error, and, number two, there's a model jury instruction, which is the instruction that Judge Raffiti gave. But the bottom line is that that model jury instruction is not based on any authority whatsoever. If you look at the comment to that model jury instruction, nothing is cited. And the plain language of the statute says that the defendant has to knowingly or intentionally possess a listed chemical. And so to then instruct the jury that it doesn't matter whether the defendant knew that what he possessed was a listed chemical, all he had to do was have reasonable cause to believe that it would be used to manufacture a controlled substance, it's completely writing out the specific mens rea that's included in that statute. And there's no basis, there's no legal authority that supports the model jury instruction. And if you look at the Supreme Court cases, the recent ones dealing with mens rea of offenses, they are they go bend over backwards to construe mens reas in an expansive manner. And in this case, what we're doing is we're actually writing the mens rea out of the statute. And it's particularly dangerous because now what we have is a situation where a defendant can, he doesn't have to know that what he possesses is a listed chemical. And remember, the mens rea for 841C doesn't require that he know that the substance is going to be used to manufacture a controlled substance. All it requires is that he have a reasonable cause to believe that the substance may be used to manufacture a controlled substance. So what we have here is almost, we have no mens rea at all. The defendant doesn't need to know it's a listed chemical, and he doesn't need to know that it's going to be used to manufacture a controlled substance. He just needs to have a reasonable cause to believe that. Wouldn't that be harmless error in this case? Didn't Mr. Lowe testify that his intent was to cheat his customers, that he was, he wanted them to believe that this was, could be used for the manufacture of methamphetamine and he was going to defraud them? Wasn't that his defense? Right. But that, but there was, there's no evidence, or at least I don't believe the evidence is overwhelming or strong that he knew that this furniture oil that he possessed was a listed chemical. And the defense was he was trying to swindle the government agents and the informants. But there was nothing introduced to show that he knew that this substance, whatever it was, this oil, was actually a listed chemical. And that's why I don't think that it's simply harmless error in this case, because what we need to look at is, did Lowe, did Mr. Lowe know that the substances were listed chemicals? I don't think the evidence is overwhelming as to that, particularly when we start factoring in all these technical chemical issues that we've talked about. And when you, and so to the extent that he had a reasonable cause to believe that they'd be used to manufacture controlled substances, that's only the second prong, that's only the second mens rea that's involved. What I'm focusing in on is the first mens rea. Did he know that these substances were listed chemicals? And I don't think it's harmless as to that. And if there are no other questions, I've got 13 seconds, so. Thank you. Maris, I did not reserve any time, but I would like to answer any questions the Court has. I'm still troubled by whether the fedrine maintained a separate chemical existence within the Ma Vong. And if you just want to point to me the testimony in the record that says that. There was no dispute about that, Your Honor. No dispute about whether it was a mixture or a chemical compound? Right. Because the government expert testified that the fedrine could be extracted from the Ma Vong by using a solvent, which is a chemical term for a substance that just extracts, doesn't chemically combine with another substance, but just extracts another substance. And she testified that it was like boiling tea. That's how you would extract caffeine out of a tea leaf. It's there naturally and you just boil it. There's not a chemical reaction. And that was her testimony. She said, page 89 of the government's experts, you can use water to extract the fedrine. Defendant's experts simply steamed. But under dust, isn't just being able to extract not enough? It's a two-part test, right? It isn't. Chapman? It is enough, because Chapman, for example, had LSD that was mixed with blotter paper. And Chapman, because the LSD on the paper maintained its chemically identical form, the Supreme Court held that it was a mixture. And that even though it was not readily separable, when someone consumes the LSD, they consume the blotter paper as well. They don't separate it. Because the LSD is in its chemically identical form, mixed in with the particles of the blotter paper, the Supreme Court said this is a mixture, a term of art, meaning the LSD is in its chemically identical form. There was no dispute about that here. Even defendant's experts said, did you try to – he answered the question, you know, are you trying to extract the fedrine that exists naturally in the malwang? He said yes. And he ultimately extracted 1.2 percent using steaming. So this is in contradiction to if we tried to prosecute a substance – if we tried to prosecute a crack case where we had powder cocaine and baking soda, we can't prosecute that. Maybe it's a conspiracy case, but the person does not have crack, cocaine-based, until those two are mixed together and you have a different substance. What Dawes held was when the substance, such as a fedrine, is in its chemically identical form in the pill, it's a mixture, meaning it's mixed in with the – Can you extract a fedrine or another illicit chemical from a compound? Under the technical terms of art, Your Honor, you can't and still prosecute it because if it's a chemical compound, the Supreme Court's definition is that's in contradiction to a mixture. So if the fedrine were chemically combined in some way, so there was a different substance – My question is a little bit different. Yes. Can you extract it from a compound? In common sense terms, yes, you can because you can take it out of there and you can use it. So what's the difference? Well, there's not a practical difference, but what I'm conceding is that if we had some substance where there was not a fedrine in its chemically identical form but you had to mix it with baking soda or something else to cause a reaction, a chemical reaction, we wouldn't have the fedrine to start and that's how the definition of chemical compound is defined, in contradiction to mixture. So in our layman's terms – Do you agree with the reading of Chapman and Dawes that a mixture can be prosecuted but a chemical compound cannot? Yes, because in a mixture that means that the substance of fedrine is in there in its chemically identical form, which there was no dispute about. Okay, so but if we were to find that this was a chemical compound as opposed to a mixture, then Judge Rapitti was right to enter a judgment of acquittal. That would be true, but there's not a shred of evidence for that. There's not a shred of evidence that it's a chemical compound. Tell us where you were of any case that so holds. That holds that it's a chemical compound? That an attempt to prosecute someone for a fedrine, assuming for a moment that a fedrine could ever be in a chemical compound without ceasing to be a fedrine, any case that directly addresses that issue and resolves it? There is not. The case that directly addresses this is Dawes. The only difference between this and Dawes is that here the fedrine is mixed in with different materials. It's mixed in with plant materials in an extract that's been standardized to 8 percent, presumably by the people that harvested and packaged it. In Dawes, the fedrine was mixed in with another active ingredient, a decongestant and binding material. So it was mixed in with other stuff. And so the cases that address it, Dawes and Chapman, are talking about it's a bright-line test. Look at whether it's in its chemically distinct form. If it's not in its chemically distinct form, you wouldn't be possessing the substance. You'd be possessing something else. All right. Oh, go ahead. Before you sit down, I'd like you to address one of the counsel for Mr. Lowe's arguments about the conspiracy count. Yes. And he reads the U.S. Supreme Court decisions holding that where A and B are, I'm paraphrasing, of course, where A and B are indicted for conspiring with each other and others, and B is acquitted. A is not necessarily entitled to an acquittal if there is evidence in the record to support an inference that he conspired with the others. But that the Supreme Court's decision is consistent with the holding that if the only evidence has to do with A and B and B is acquitted, A must be acquitted, too. Do you agree with that analysis of the Supreme Court decision? No. And that analysis was definitively rejected by this Court in Valis, Valencia, cited in defendant's briefs. decision in Powell, this Court held that when A is acquitted, B must be acquitted, too, if the only evidence is between the two of them. And in Valis, Valencia, the Court actually undid its opinion because Powell came out at, you know, well, it was, I guess a petition for re-hearing was pending or something procedurally like that. And they said, you know, this circuit's old law before 1987 was wrong, and now you look at it just like sufficiency evidence. So this Court should review, as it must under the law, the conspiracy conviction just as if defendant was indicted alone or as if the co-defendant was convicted as well and tried inferences in favor of supporting the jury's verdict. The government isn't relying on the person's known or unknown. They're just relying solely on Mrs. Kwan. We would rely alternatively on the others, but this Court does not need to get there because there's plenty of evidence that defendant Kwan. But she agreed to distribute them along with the intent of manufacturing methamphetamine? There's sufficient evidence of that because it's. That's the question. Okay. Suppose we were to decide against you on that. What's the evidence with the person's known or unknown other than the confidential informant, which you can't rely on? There's actually pretty significant evidence on a videotape conversation that I know the Court requested. The videotapes. We can't find that videotape, can we? I'm sorry? That particular videotape? Government's Exhibit 65 is a videotape that the key parts of this between 3.30 p.m. and 3.40 p.m., defendant Lowe is talking to the informant Sotelo in Sotelo's garage, and they're talking about the amount of the precursor drug for ecstasy that Lowe is giving to the undercover officer to make ecstasy, and Lowe is concerned that the officer is going to make some for himself on the side, and Lowe wants to have his people there watching the cook of the ecstasy to make sure that the undercover cop, who doesn't know his undercover cop, is not going to make some on his own. Lowe also mentions that his people are working on with the country of Holland to try to find out a way to send his precursor drugs over there to make that. So that, in combination with the fact that there's wiretap conversations showing the defendant is distributing Ma Wong, along with two individuals who are on the wiretaps, Hector Escobedo and Adelmo Uribe, along with a couple other individuals who appear helping out defendant at times, would be enough, we would argue, on people other than the defendant being involved with the conspiracy. The Court ---- Kagan. Did you produce that videotape and do you have it in the record? In response to questions from the clerk's office, we did hand over the videotapes, including this. It's Government's Exhibit 65, beginning at 3.3. That's the most concrete reference to other people that the defendant makes. And I don't think the Court needs to get to this because there's plenty of evidence on Kwan's conspiracy with the defendant, including her removing labels from the large quantities of Ma Wong that are being purchased. She's on another videotape loading heavy barrels of this Ma Wong into a van. Forty of the barrels are seized from her home. She's at a meeting on April 4, 2002, with the defendant and an undercover officer, where they're talking about making ecstasy. There's enough evidence for conspiracy to support a rational jury verdict on conspiracy just with her and the defendant. All right. Thank you, Counsel. Thank you, Your Honors. All right. U.S. v. Lowe is submitted.
judges: Hug, Wardlaw, Singleton